SCHROEDER, Senior Circuit Judge,
joined by
PAEZ, BERZON and MURGUIA, Circuit Judges, dissenting:
I respectfully dissent. The majority holds substantively unreasonable a 22-year sentence that is 13 years less than the government’s request in its sentencing memorandum, and only 8 years less than what the government conceded at oral argument it would have accepted without appealing to this court. In light of the district court’s sentencing discretion, I would exercise a more appropriate level of deference, and affirm.
The district court’s explanation of this sentence shows that the court followed this circuit’s law. See United States v. Maier, 646 F.3d 1148, 1156 (9th Cir.2011) (citing United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir.2009) (en banc)). The court noted it could not presume that the advisory Guidelines range is reasonable. See United States v. Carty, 520 F.3d 984, 991 (9th Cir.2008) (en banc). The court said that it had considered the 18 U.S.C. § 3553(a) factors, in addition to the Guidelines, in arriving at the sentence it imposed. It went through each of those factors, explaining the weight it assigned to each, and why. The district court had lived with the case for nine years and its explanation reflects its familiarity with the history of the case and with the defendant.
The government has at no time contended that the district court committed procedural error in imposing this sentence, or that it made any clearly erroneous findings. In their sentencing memoranda, both sides sought sentences that amounted to substantial downward variances from the bottom end of the Guidelines range, which was 65 years. The defendant asked *1101 for a sentence of 15 years, and the government for 45. The 22-year sentence imposed was thus well within the range of alternatives proposed to the district court. (At the sentencing colloquy, only after the defendant said he would not object to any sentence that the district court imposed— even life — did the government up its recommendation to life.)
To justify its conclusion that the sentence is too low, the majority focuses on the district court’s explanation of the weight it gave two of the relevant § 3553(a) factors.[1] The majority insists, though the government has never argued, that the explanation included at least two “findings of fact” that were “clearly erroneous.” The first and most important was the weight given to Ressam’s cooperation, and a second was the court’s characterization of the life Ressam lived before his offense conduct. Yet these were not findings of fact, but part of the court’s explanation of how it weighed the statutory sentencing factors.
The majority undoes the district court’s sentence, and in so doing commits the same error that the Supreme Court ascribed to the Eighth Circuit in Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The Supreme Court faulted that circuit court for reweighing the § 3553(a) factors when the circuit court didn’t like a district court sentence that was far below the Guidelines range. In Gall the district court had given probation to a defendant involved in a large drug conspiracy and facing a Guidelines minimum of 30 months. The Supreme Court said:
The Court of Appeals clearly disagreed with the district judge’s conclusion that consideration of the § 3553(a) factors justified a sentence of probation; it believed that the circumstances presented here were insufficient to sustain such a marked deviation from the Guidelines *1102 range. But it is not for the Court of Appeals to decide de novo whether the justification for a variance is sufficient or the sentence reasonable. On abuse-of-discretion review, the Court of Appeals should have given due deference to the District Court’s reasoned and reasonable conclusion that the § 3553(a) factors, on the whole, justified the sentence. Accordingly, the judgment of the Court of Appeals is reversed.
Id. at 59-60, 128 S.Ct. 586.
The majority makes the same mistake. When the three-judge panel reversed Ressam’s sentence, we voted to take this case en banc because, presumably, a majority of our active judges had serious reservations about the wisdom of the panel majority’s reversal, given the discretion the district court enjoys in sentencing. The dissent of Judge Fernandez from the original panel opinion had it right:
So where does that leave the majority? Simply put, it seems to me that the majority just does not like the fact that this terrorist is to sit in prison for a mere twenty-two years. What number would the majority choose; who knows? But although many federal sentences are even more draconian, twenty-two years seems like a long time to me, whether a defendant is young or old to start with. It is not a mere slap on the wrist, especially if the confinement conditions will be especially harsh, as the district court predicted they would be. Yet, when all is said and done, the majority simply does not like the way the district court weighed the evidence before it; obviously the majority would have done it differently....
In short, the sentence was neither procedurally erroneous nor substantively unreasonable. See Carty, 520 F.3d at 993. Even if we have to grit our teeth to do so, we should let it be.
As well we should have had reservations about the panel majority’s reversal of the district court’s sentence. Only a year or so earlier, our court had gone en banc in Hinkson, to consider how the “abuse of discretion” standard of review “limits our power as an appellate court to substitute our view of the facts, and the application of those facts to law, for that of the district court.” 585 F.3d at 1250. We said that we were approving a “newly stated ‘abuse of discretion’ test [that] requires us first to consider whether the district court identified the correct legal standard for decision of the issue before it ... [and] then requires us to determine whether the district court’s findings of fact and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record.” Id. at 1251; see also Maier, 646 F.3d at 1156 n. 3.
Such review for abuse of discretion is not rubber-stamping. It is the role of the appellate courts as mandated by the Supreme Court. See Gall, 552 U.S. at 57, 128 S.Ct. 586 (after review for procedural error, the appellate court then considers “substantive reasonableness ... under an abuse-of-discretion standard”).
Thus to me the majority opinion is all the more disturbing, because while it cites Hinkson, it never comes to grips with the impact Hinkson’s holding should have had on this case. There is no question in my mind that the district court in this case identified the correct legal standard for its decision, as laid down by the Guidelines and § 3553(a). It applied that standard to the facts before it, explaining its application of the § 3553(a) factors and relying on nothing that could be said to be “illogical, implausible, or without support” in the record. Hinkson, 585 F.3d at 1251.
*1103 This is best illustrated by comparing the way the district court evaluated the defendant’s cooperation with the way the majority attempts to disregard it. The majority’s obsession with the magnitude of the crime the conspiracy planned to commit has led the majority to distort both the record and how the district court exercised its discretion on the basis of that record. The majority has apparently decided that the district court both weighed Ressam’s cooperation too heavily and failed adequately to account for the fact that it ended. The district court’s explanation of how it weighed Ressam’s cooperation, however, was not a finding of fact susceptible to clear error review. Rather, the court explained how it weighed the statutory sentencing factors, which must include, in addition to the nature and circumstances of the crime, the defendant’s history and characteristics. § 3553(a)(1). The Guidelines, in § 5K1.1, allow the government to request a downward departure for substantial assistance, and the government asked for one here. At sentencing, the district court reviewed Ressam’s history of cooperation, including the benefits of his cooperation and the unfortunate consequences of his cessation and partial recantation. That history is fully in accord with the record in this case.
Of particular1 salience to the district court was the intelligence Ressam provided to the United States and to foreign governments about terrorist methods and organizations. The majority brushes this information aside by noting the government’s assertion that the information Ressam provided was not unique to him. While some of this information was previously known to the United States intelligence community, Ressam’s position as an unclassified source permitted the United States to disseminate this intelligence to foreign allies. That was what the district court relied upon.
Other evidence in the record supports the district court’s assessment of the overall value of Ressam’s cooperation. The United States Attorney for the Southern District of New York filed a thirty-nine page letter with the court below, detailing how Ressam had earlier provided extensive cooperation. Although the end of Ressam’s cooperation burdened the government’s ability to pursue several criminal prosecutions, he provided a wealth of information otherwise not susceptible to later recantation or retraction. Ressam also provided, for example, operational assistance to investigators tasked with defusing the explosive device carried by Richard Reid, the “shoe bomber.” The district court therefore accurately characterized Ressam’s role as an informant as having contributed “extensive intelligence that proved to be invaluable in the fight against international terrorism.”
Having concluded, incorrectly, that Ressam’s information had no value, the majority dismisses as “clearly erroneous” the district court’s observation that recognizing the value of Ressam’s cooperation would serve as an incentive for future terrorist informants. The problem is that while the district court focused on the net value to the government of Ressam’s cooperation — taking into account its cessation — the majority focuses on the cessation and never confronts the district court’s assessment of net value.
The majority goes so far as to suggest that the district court abused its discretion by not adopting the government’s position that Ressam should receive no credit for his cooperation because it did not continue. The majority may disagree with the weight the district court assigned to the net value of Ressam’s cooperation, yet the district court’s assessment of the net value and the weight it assigned that value as a sentencing factor were matters within its *1104 discretion to decide. See United States v. Gutierrez-Sanchez, 587 F.3d 904, 908 (9th Cir.2009). The district court considered the entire history of Ressam’s cooperation. Just as we should not rubber-stamp the district court, we should not suggest the district court must rubber-stamp the government’s sentencing positions. See, e.g., United States v. Livesay, 525 F.3d 1081, 1091 (11th Cir.2008) (“[Ajfter the government has made a motion for downward departure pursuant to U.S.S.G. § 5K1.1 the government has no control over whether and to what extent the district court will depart from the Guidelines.”). The Guidelines require the court to give “substantial weight” to the government’s assessment, U.S.S.G. § 5K1.1, cmt. 3, but any such assessment must reflect the entire history of cooperation up to the time of sentencing. See United States v. Awad, 371 F.3d 583, 588 (9th Cir.2004).
It is thus important to comprehend fully how scrupulously the district court followed § 3553(a) in weighing each of its factors. I therefore turn first to the district court’s analysis, and then, sadly, observe the similarities of this case to Gall— a further illustration of Santayana’s adage that those who do not study history are condemned to repeat it. George Santayana, 1 The Life of Reason 284 (1905).
The district court, true to the commands of § 3553(a), expressly recognized the need for the sentence to reflect the seriousness of Ressam’s offenses, and to provide just punishment and promote respect for the law. The court began by setting forth the legal standard:
The Ninth Circuit has made clear that the Sentencing Guidelines are only one factor to be considered among those factors set forth in 18 U.S.C. Section 3553(a), in determining an appropriate sentence. I may not presume that the Guidelines range is reasonable. Nor should the Guidelines factor be given more or less weight than any other factor. Accordingly, I have also considered the other Section 3553 factors in arriving at the sentence I am imposing today.
The district court then turned to the seriousness of Ressam’s offenses:
On the one hand I recognize the need for the sentence imposed to reflect the seriousness of the offenses Mr. Ressam has committed, to provide just punishment for those offenses, and to promote respect for the law. Mr. Ressam’s crimes, if carried to them intended conclusion, would have resulted in the deaths and injuries of hundreds of innocent people and instilled fear across the country and even the world. Fortunately, Mr. Ressam’s arrest prevented such an outcome. Because of the worth of an attentive Port Angeles Customs Inspector, Mr. Ressam’s crimes did not lead to loss of life or limb, nor destruction of property. Nevertheless, the seriousness and heinousness of the act of terrorism Mr. Ressam was carrying out at the time of his arrest cannot be understated.
The court described Ressam’s cooperation in cases that were successfully prosecuted, and the basis of the government’s motion for a downward departure:
On the other hand, I recognize Mr. Ressam’s extensive and valuable cooperation in the fight against terrorism during the first two years after his trial. Although it ended unwisely and prematurely, Mr. Ressam’s cooperation, unique in its breadth and scope, weighed heavily in my initial sentencing decision and its import has not changed in my analysis today. The government’s 5K1.1 motion filed in February 2003 requested a downward departure from the Sentencing Guidelines based on Mr. Ressam’s substantial assistance in the case of United States versus Mokhtar Haouari, a matter prosecuted in the Southern *1105 District of New York in the Summer of 2001 and resulting in the conviction of Mr. Haouari.
Mr. Haouari was sentenced in 2002 to a term of 24 years’ imprisonment. Mr. Ressam’s testimony at the trial connected Mr. Haouari to the terrorist plot, of which Mr. Ressam himself was a part, to bomb the Los Angeles International Airport on New Year’s Day 2000. In addition to his substantial cooperation in that case Mr. Ressam also testified before a German tribunal on behalf of the German government in the trial against Mounir el Motassadeq ... in December 2002, which resulted in a conviction and sentence of 15 years.
The district court then acknowledged the negative effects of Ressam’s decision to end cooperation and retract his statements, a decision that led to dismissal of two prosecutions. It concluded other information Ressam provided about international terrorist activity outweighed those negative effects:
The Court recognizes that Mr. Ressam’s later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects. However, Mr. Ressam’s cooperation, while it lasted, provided the United States government and the governments of Great Britain, Spain, Italy, Germany, France and Canada extensive intelligence that proved to be invaluable in the fight against international terrorism. The defendant’s sentencing memorandum submitted before the July 2005 sentencing hearing summarizes the far-reaching impact of Mr. Ressam’s cooperation on the investigations and prosecutions of terrorist activities in this country and abroad.
Finally, the district court turned to the subject of fairness and of the impact of confinement Ressam had already and would continue to experience:
Downplaying the cooperation that Mr. Ressam provided the government would diminish the likelihood of future cooperation by other apprehended terrorists. Further, doing so would not be fair to Mr. Ressam. After his trial he told me that the fairness of his trial was not what he expected, given what he had done. The fair treatment that Mr. Ressam received in his public trial was a major influence on his decision to break with his past and cooperate, a choice that undoubtedly saved innocent lives. In making that decision, he put his own life at risk. In addition, he has spent years in solitary confinement in a country far from his family and loved ones and will, by any measure, be sacrificing a large portion of his life for his crimes.
The majority thinks that the district court gave too much weight to the value of Ressam’s cooperation, and too little weight to the effect of his cessation of cooperation. Yet, as the discussion above reveals, its position mirrors that of the Eighth Circuit in Gall, where the Supreme Court described such reweighing as de novo review that failed to give adequate deference to the district court. The Eighth Circuit in Gall, for example, had erred by saying that the district court gave “too much weight to Gall’s withdrawal from the conspiracy.” 552 U.S. at 45, 128 S.Ct. 586. The majority here says that the district court gave too much weight to the information Ressam provided during his cooperation. If the Eighth Circuit’s conclusion was improper de novo review, then so is the majority’s.
The majority also concludes that the district court was “clearly erroneous” in characterizing Ressam’s prior life as “quiet, solitary, and devout,” and that this history “supported] favorable sentencing *1106 consideration.” The district court was accurately describing what the record showed about the defendant’s life before his mid-twenties, and, in any event, gave it no undue weight. The district court was following the statutory requirement that it look both to “the nature and circumstances of the offense and the history and characteristics of the defendant.” § 3553(a)(1).
The majority appears to justify its focus on the nature of the offense, rather than on any of the other relevant statutory factors, because the majority apparently thinks — as my colleague Judge Reinhardt’s concurrence makes explicit — that terrorism is different, and Ressam’s offense more terrible than the district court appreciated. Nothing in the record bears this out. The district court was well aware of the statutory command to consider the circumstances and seriousness of the offense in sentencing. § 3553(a)(1). It did consider them, explaining that the “seriousness and heinousness of the act of terrorism Mr. Ressam was carrying out at the time of his arrest cannot be understated.” The district court had to weigh all the factors in arriving at a sentence sufficient, but not greater than necessary, to serve the purposes of punishment. § 3553(a).
The statutes and Guidelines treat terrorism as a matter of serious criminal concern, but not as something new and different. The majority’s implicit assumption that terrorism is different, and must be treated differently, thus flies in the face of the congressionally sanctioned structure of sentencing that applies to terrorism as well as all other kinds of federal criminal offenses. Our courts are well equipped to treat each offense and offender individually, and we should not create special sentencing rules and procedures for terrorists. In presiding over the many terrorism-related cases on their dockets, courts have treated other issues in terrorism cases in ways that do not differ appreciably from more broadly applicable doctrines. See, e.g., Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2079, 2083, 179 L.Ed.2d 1149 (2011) (holding that ordinary qualified immunity standard protects officials in a suit alleging an unconstitutional use of the material witness statute for detaining terrorism suspects); Jewel v. Nat’l Sec. Agency, 673 F.3d 902, 905-06, 908-12 (9th Cir.2011) (concluding that a putative class representative had constitutional and prudential standing to challenge the government’s post-September 11 policy of widespread warrantless eavesdropping); In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 167 (2d Cir.2008) (applying traditional principles to hold that the Fourth Amendment’s Warrant Clause has no extraterritorial application and that foreign searches of U.S. citizens conducted by U.S. agents are subject only to the Fourth Amendment’s requirement of reasonableness); MacWade v. Kelly, 460 F.3d 260, 263 (2d Cir.2006) (upholding government’s use of random, suspicionless container searches in the New York City subway system, on grounds that preventing a subway terrorist attack is a non-investigative special need within the meaning of Fourth Amendment doctrine); see also Aziz Huq, Against National Security Exceptionalism, 2009 Sup.Ct. Rev. 225, 226 (concluding that courts’ responses to national security emergencies do not treat terrorism as different, but rather “align more closely with ... judicial responses to nonsecurity emergencies”). Just as we have resisted treating terrorism differently in these cases, we ought to resist doing so in reviewing sentences for reasonableness as well.
The majority expresses concern that the 22 years meted out, including years already served, means that Ressam will be only 51 years old at the time of his release. *1107 The district court, of course, was well aware of Ressam’s age, having presided over his case for nine years and having faced him at two sentencings. The district court thus took into account what the majority does not: precisely because Ressam is a convicted terrorist, he will be kept in solitary confinement “in a country far from his family ... and will by any measure, be sacrificing a large portion of his life for his crimes.” Ressam is currently confined at the Administrative Maximum Facility in Florence, Colorado, where a number of terrorist offenders are held. There inmates are “sealed off for 23 hours a day in cells with four-inch-wide windows and concrete furniture,” and may receive “an hour’s exercise each day in a tiny yard, ... alone, ... if they behave.” Judith Resnik, Essay, Detention, The War on Terror, and the Federal Courts, 110 Colum. L.Rev. 579, 678 n. 425 (2010) (quoting Peter Finn, Detainees Face Severe Conditions if Moved to U.S., Wash. Post, Oct. 4, 2009, at A6).
The majority’s assumption that upon release from prison after decades of such confinement, Ressam would engage in further terrorist conduct, is speculative, unwarranted, and without support in the record, including the sealed presentence report. The available evidence in the record reflects experts’ beliefs that Ressam posed little threat of future dangerousness to himself or others. The sealed presentence report noted that monthly psychological evaluations were conducted during Ressam’s time in custody. Ressam’s counsel engaged Dr. Stuart Grassian, a psychiatrist, to evaluate his mental state in 2003 and 2004. Dr. Grassian’s report concluded that Ressam would not be a danger to the community upon release. The majority’s assumption of future dangerousness is, therefore, contradicted by the record evidence. Its further prediction that Ressam would return to Algeria upon release to inspire future terrorists, is pure speculation unsupported by any record evidence.
The majority cites the Eleventh Circuit in United States v. Jayyousi, 657 F.3d 1085 (11th Cir.2011), where that court made a similar assumption of future dangerousness. Although the Eleventh Circuit acknowledged the general presumption that recidivism rates decrease as offender age increases, it relied on its previous holding that the presumption does not apply to certain sex offenders, and held the presumption should not apply to terrorists either. The comparison of terrorists to sex offenders in terms of their recidivism is criticized in Judge Barkett’s dissent, and I believe the dissent has the better of the argument. See id. at 1117-19 (noting that the previous holding as to sex offenders had been based on empirical studies about recidivism, and explaining that the assumption about terrorists was without any support in the record). Here, as in Jayyousi, the majority faults the district court for failing to make findings that would have had no basis in the record. The district court here made no such error, and its reasoning reflects a measured consideration of the record.
The majority also takes the district court to task for looking to sentences given to other terrorists. The district court compared Ressam’s case to other terrorist prosecutions that were, of course, different from Ressam’s in that the other defendants pleaded guilty or were convicted of less serious offenses. Those defendants also did not cooperate with the government, as Ressam did for a considerable period. One can speculate that the district court placed too much emphasis on these comparisons, even given the statutory admonition that the court consider “the need to avoid unwarranted sentence disparities *1108 among defendants with similar records who have been found guilty of similar conduct.” § 3553(a)(6). The important point, however, is the factor was one that the district court had to weigh, and is not for us to reweigh. See Gall, 552 U.S. at 51, 128 S.Ct. 586. The district court did the best it could to evaluate possible disparities with sentences of other convicted terrorists while remaining fully aware of the fact that Ressam’s case was not similar to those in all respects. Its efforts to follow the statutory sentencing factors lend no support for the majority’s conclusion that the district court’s sentence was unreasonably low.
In avoiding unwarranted disparities, as in evaluating other key sentencing factors, district courts have enormous discretion. The Supreme Court has consistently instructed us, and we have reminded ourselves, that the appellate courts cannot substitute their judgment for that of the district judge. See, e.g., id. at 51, 128 S.Ct. 586 (“The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.”); see also Koon v. United States, 518 U.S. 81, 97, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (“[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.”) (citations omitted); accord Carty, 520 F.3d at 993 (“We may not reverse just because we think a different sentence is appropriate.”); United States v. Whitehead, 532 F.3d 991, 993 (9th Cir.2008) (per curiam) (“Even if we are certain that we would have imposed a different sentence had we worn the district judge’s robe, we can’t reverse on that basis.”) (emphasis added). The majority seemingly ignores all this law.
The majority’s criticisms of the district court, and this dissent, amount to no more than disagreement with the 22-year sentence imposed. That is not enough to warrant reversal. The district court carefully explained its reasons for imposing that sentence, as we have required in order to facilitate “meaningful appellate review.” Carty, 520 F.3d at 992. But the burden is not on the district court to establish that its sentence is reasonable. Rather, the appellate court must affirm unless the district court committed procedural error or imposed a substantively unreasonable sentence. See id. at 993; Gall, 552 U.S. at 51, 128 S.Ct. 586. The majority has not satisfied its burden of showing the district court’s sentence was unreasonable.
Not only does the majority make the same mistakes for which the Supreme Court reversed the Eighth Circuit in Gall, but it overlooks another, somewhat eerie, similarity between this case and Gall. As the Supreme Court noted, the trial judge in Gall was extremely experienced, having sentenced nearly 1000 offenders. See 552 U.S. at 52 n. 7, 128 S.Ct. 586. The district judge’s experience in this case is comparable, for a search of Lexis-Nexis Analyzer docket records showed that this judge has presided over at least 1000 criminal dockets. The district court’s experience here, as in Gall, should make us even more cautious in our deferential review. We defer to the district courts’ exercise of discretion — regardless of experience — because of the differing day-to-day roles of trial and appellate judges. See Hinkson, 585 F.3d at 1259-60. In Hinkson, we explained why we apply deferential review to the district courts’ factual and discretionary decisions, referring to the district courts’ “experience with the mainsprings of human conduct,” so that “the concerns of judicial administration will favor the district court.” Id.
The majority disregards that wisdom, and contorts our proper institutional role here. In our everyday lives we often say *1109 that we should all practice what we preach. As an appellate court we are bound by law either to practice what we have preached, or to repudiate it. The majority does neither.
I therefore must respectfully, but regretfully, dissent.

. Section 3553(a) directs a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the offender;
(2) the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for — (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines — (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced ...;
(5) any pertinent policy statement — (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense."