19-4167-cv
*Torcivia v. Suffolk County, New York, et al.*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2020

(Argued: December 9, 2020     Decided: November 9, 2021)

Docket No. 19-4167

WAYNE TORCIVIA,

*Plaintiff-Appellant,*

–v.–

SUFFOLK COUNTY, NEW YORK, POLICE OFFICER JAMES ADLER, individually and professionally, POLICE OFFICER PHILIP HALPIN, individually and professionally, POLICE OFFICER ROBERT VERDU, individually and professionally, MARY CATHERINE SMITH, individually, KRISTEN STEELE, individually, DIANNA D'ANNA, individually, ADEEB YACOUB, M.D., individually,

*Defendants-Appellees,*

INVESTIGATOR THOMAS CARPENTER, individually and professionally, CAPTAIN WILLIAM SCRIMA, individually and professionally, POLICE OFFICERS JOHN DOE 1 & 2, individually and professionally, who responded to Plaintiff's home at 60 Creighton Avenue, Lake Ronkonkoma, New York with Officer Adler around 12:00 a.m. on April 6, 2014, POLICE OFFICERS JOHN DOE 3 & 4, individually and professionally, who confiscated Plaintiff's weapons from his home on April 6, 2014, POLICE OFFICERS JOHN DOE 5-15, individually and professionally, BRIDGET WALSH, individually, MICHELLE SANCHEZ, individually, TIMOTHY J. AIELLO, individually, JOHN AND JANE DOES 1-10, individually,

*Defendants.*[*]

———————

B e f o r e :

CABRANES, LYNCH, and CARNEY, *Circuit Judges*.

———————

The primary issue presented by this appeal concerns the boundaries of the Fourth Amendment's prohibition on warrantless seizures. Shortly after midnight on April 6, 2014, Suffolk County police officers came to Plaintiff-Appellant Wayne Torcivia's home in response to what was described to them as a violent domestic incident, after Torcivia's daughter called an emergency child protection hotline. The officers determined that Torcivia, who admittedly had been drinking, needed to be transported to a State-run mental health facility for evaluation. While he was at the facility, the officers seized his firearms from his home pending further investigation. Torcivia argues that in doing so, the officers acted pursuant to an official County policy or custom that violated the Fourth Amendment, making the County subject to *Monell* liability for the seizure. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). We conclude that the District Court correctly determined that the County is not liable under *Monell* because its policy falls within the "special needs" exception to the Fourth Amendment's warrant requirement, and, under the circumstances presented, the County's policy did not cause a violation of Torcivia's Fourth Amendment rights. Torcivia further contends that certain evidentiary rulings made at trial on his remaining claims against three County police officers were erroneous. He also challenges the District Court's determination that employees of the State-run mental health facility (and an intern supervised by them) were entitled to qualified immunity under federal and New York law for claims related to their alleged failure to discharge Torcivia promptly. On review, we find no basis for reversal or for a new trial.

AFFIRMED.

———————

———————

[*] The Clerk of Court is directed to amend the case caption to conform to the above.

AMY L. BELLANTONI, The Bellantoni Law Firm, PLLC, Scarsdale N.Y., *for Plaintiff-Appellant Wayne Torcivia*.

ARLENE S. ZWILLING (Dennis M. Cohen, *on the brief*), Office of the Suffolk County Attorney, Hauppauge, N.Y., *for Defendants-Appellees Suffolk County, New York, Police Officer James Adler, Investigator Thomas Carpenter, Captain William Scrima, Police Officer Philip Halpin and Police Officer Robert Verdu.*

DAVID LAWRENCE III, Office of the New York Attorney General, New York, N.Y., *for Defendants-Appellees Dianna D'Anna, Kristen Steele, and Adeeb Yacoub, M.D.*

SCOTT CHRISTESEN, Fumuso, Kelly, Swart, Farrell, Polin & Christesen LLP, Hauppauge, N.Y., *for Defendant-Appellee Mary Catherine Smith.*

CARNEY, *Circuit Judge*:

The primary issue presented by this appeal concerns the boundaries of the Fourth Amendment's prohibition on warrantless seizures.

Shortly after midnight on April 6, 2014, Suffolk County police officers came to the home of Plaintiff-Appellant Wayne Torcivia in response to what was described to them as a violent domestic incident. They were dispatched following Torcivia's teenaged daughter's call to an emergency hotline. After arrival and an initial assessment of the situation, the officers determined that Torcivia needed to be transported to a mental health facility for evaluation. Later the same day, they seized firearms from his home pending further investigation. Torcivia sought damages from the County, arguing that the officers acted pursuant to an official County policy or custom that violated the Fourth Amendment. We conclude that the District Court correctly determined that the County's policy falls within the "special needs" exception to the

3

Fourth Amendment's warrant requirement, and that, on the facts presented here, actions taken under the County's policy did not violate Torcivia's Fourth Amendment rights.

Torcivia further contends that certain evidentiary rulings made at trial on his remaining claims against three County police officers were erroneous. He also challenges the District Court's determination that employees of the State-run mental health facility (and an intern supervised by them) were entitled to qualified immunity under federal and New York law for claims related to their alleged failure to discharge Torcivia promptly from the facility. On review, we find no basis for reversal or a new trial on any of these grounds.

## BACKGROUND

### I.     Factual history

We recite the facts as set forth by the District Court in its ruling on summary judgment and based on the parties' Rule 56.1 submissions, deposition testimony, and exhibits to their Rule 56 cross-motions. As described below, the parties differ substantially as to the circumstances of Torcivia's transport to and his discharge from the State mental health facility. The events at issue were the subject of deposition testimony and testimony adduced at trial.[1]

---

[1] The record before us contains excerpts of deposition testimony given by Wayne Torcivia, Jennifer Torcivia (Wayne's wife), Adrianna Torcivia (Wayne's daughter), Sergeant Walter Scott, Officer Robert Verdu, Officer Patrick Halpin, Officer James Adler, Dianna D'Anna, Dr. Adeem Yacoub, Mary Catherine Smith, Kristen Steele, Geraldine Azus, Jennifer Andriano, Bridget Walsh, and Timothy Aiello. It also includes exhibits attached to the parties' motions and the trial transcript, including the trial testimony of Wayne Torcivia, his wife (Jennifer), son (Joseph Torcivia), Dianna D'Anna, and Officers Adler, Halpin, and Verdu. Adrianna Torcivia gave extensive deposition testimony, which is in the record, see App'x 585-629. Adrianna did not comply, however, with a subpoena to appear at trial.

A. The police response at Torcivia's home

Just before 1:00 a.m. on Sunday, April 6, 2014, the Suffolk County Police Department broadcast a call for officers to respond to what the dispatcher described as "a violent, domestic dispute of a 17-year-old female and an intoxicated father." App'x at 981. The request for police presence was made in response to a telephone call made sometime after midnight by Torcivia's daughter, Adrianna, attempting to reach the Suffolk County Department of Social Services' Child Protective Services ("CPS") through a Nassau County-based social service hotline that she dialed from the family home in Ronkonkoma, New York.[2] County Police Officers James Adler, Robert Verdu, and Patrick Halpin responded to the call.

The parties disagree about what happened next. In sum, Torcivia testified that, although he "drank a few cocktails" that evening, App'x at 1270, and was having a dispute with Adrianna related to her guinea pig, he was in control of himself. He heard Adrianna making a phone call but could not tell with whom she was speaking. Not much later, the doorbell rang. After he answered the door, Officers Adler and Halpin entered the house, a split-level ranch home. Officer Verdu, who arrived after the others, remained on the front stoop. While Officer Halpin went to speak with Adrianna on the house's lower level, Officer Adler remained on the landing just inside the front door. According to Torcivia, Officer Adler's shoulder then brushed against curtains on the front door window, causing them to fall. Torcivia stated that when he went to pick up the curtains from the floor, Officer Adler told him to get back, using a profanity. Torcivia further testified that he told Officer Adler that swearing was not allowed in his

---

[2] Adrianna and her younger brother Joseph were at home when she made the call. The youngest of the three Torcivia children was away. Only Adrianna interacted directly with the police upon their arrival. Neither Joseph nor Jennifer appeared until later, when Officer Adler returned to seize Torcivia's firearms.

house, and an altercation between them ensued, during which Officer Adler "screamed," swore at Torcivia, and threatened to use a taser on him. Appellant's Br. at 5. To the alleged threat, Torcivia responded in part, "I wouldn't do that, I have a heart condition. I could die." *Id.* (citing App'x at 417, 1206-07). Officer Adler then consulted with Officer Verdu, who proposed that they transport Torcivia to Stony Brook University Hospital's Comprehensive Psychiatric Emergency Program Unit ("CPEP"), a local emergency mental health service run by New York State.[3] The officers then did so, handcuffing Torcivia first.[4]

The County Defendants (that is, Suffolk County and Officers Adler, Halpin, and Verdu) present a different account of the facts at issue. When the County Officers arrived at the house, Torcivia was in a highly agitated state: He would "jump up, yell, and scream," calm down, and then "explode again and start ranting and raving and screaming and flailing his arms." App'x at 1420-1421 (testimony of Officer Halpin); *see also id.* at 394, 1477 (testimony of Officer Adler). Torcivia was "intoxicated and threatening and belligerent" towards Adrianna, *id.* at 517, and "immediately aggressive" towards the police, *id.* at 1477 (testimony of Officer Adler). Officer Adler had a brief conversation with the individual working at the Nassau County hotline about Adrianna's call. According to Officer Adler, that individual told him that she could hear Torcivia "screaming at [Adrianna and] saying horrible things to her over

---

[3] *See* NY Connects, *Program SBUH – Comprehensive Psychiatric Emergency Program (CPEP)*, https://www.nyconnects.ny.gov/services/sbuh-comprehensive-psychiatric-emergency-program-cpep-omh-pr-813707155450 (last visited Nov. 8, 2021).

[4] Torcivia's wife, Jennifer, although home at the time, was in a "deep sleep," she later said, and was not present for the events described in this paragraph. App'x at 1362-63. She gave no sworn statement about the officers' initial visit to the house. She later testified, however, both in a deposition and at trial about Adrianna and about the circumstances under which Officer Adler seized Torcivia's firearms.

and over again." *Id.* at 1464. Officer Adler further testified that, throughout their conversation, Torcivia was upset and "would stand up and clench his fists and get loud." *Id.* at 1470.

According to the officers, it was Officer Adler, not Officer Halpin, who went to speak with Adrianna on the house's lower level. Then, when Officer Adler returned to the upper level of the house to ask about the incident involving Adrianna and her guinea pig, Torcivia was said to declare, "All right. That's it. I want you guys to tase me. I have a heart condition. If you [t]ase me, it will kill me. Please [t]ase me and kill me." *Id.* at 1471 (testimony of Officer Adler); *see also id.* at 1477 (same).[5] Officers Halpin and Verdu corroborated this testimony. *See id.* at 193 (testimony of Officer Verdu); *id.* at 1432 (testimony of Officer Halpin) ("Mr. Torcivia said he had enough and then again he said that he wanted us to taser him so that he could die."). According to the officers, this behavior and Torcivia's statements led them to conclude that they should transport Torcivia to CPEP for psychological evaluation. *See, e.g., id.* at 193 (Officer Verdu describing Torcivia's request to be tased as "the magic phrase, the phrase that got him to the point where we needed to have him evaluated").

B.      Torcivia's emergency psychological evaluation at CPEP

At about 2:00 a.m., Officer Adler arrived with Torcivia at CPEP.[6] There, he was evaluated by a CPEP team that included Dr. Adeeb Yacoub, psychiatric nurse

---

[5] Officer Adler testified that he did not recall a curtain or any kind of blinds falling off the door.

[6] The State Defendants stated in their Local Civil Rule 56.1 statement in support of their motion for summary judgment that Torcivia "was transported to CPEP pursuant to New York State Mental Hygiene Law § 9.41." App'x at 518. County Officers are authorized by that law to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41.

practitioner Dianna D'Anna, and social worker Kristen Steele (together, the "State Defendants").[7] Unpaid CPEP intern Mary Catherine Smith ("Intern Smith"), then age 65 and a master's student in Stony Brook University's social work program, was shadowing Steele and assisted the State Defendants at times during their evaluation of Torcivia.

In a measurement taken by the CPEP team at about 2:50 a.m., almost two hours after police arrived at his home early Sunday morning, Torcivia's blood alcohol level was found to be 152 mg/dL: "approximately double the legal limit . . . for driving a motor vehicle." App'x at 519.[8] Because CPEP policy does not permit its staff to conduct more than cursory evaluations of admitted persons until they are sober, the State Defendants first let Torcivia sleep. Then, beginning shortly after 2:00 p.m. on Sunday, they conducted a series of interviews with him comprising the formal evaluation.

C.    Seizure of Torcivia's firearms and Torcivia's CPEP discharge

After transporting Torcivia to CPEP—but still in the middle of the night—Officer Adler returned to Torcivia's home to gather more information. Officer Adler first spoke with Adrianna,[9] and then returned to his patrol car, where he conducted a pistol license check and learned that Torcivia had such a license. Officer Adler informed his supervisor by phone about the license and was instructed to speak with Torcivia's wife and try to "safeguard" any firearms that were in Torcivia's home. App'x at 391

---

[7] CPEP teams consist of a registered nurse, a social worker, a nurse practitioner, and an attending psychiatrist.

[8] This and other relevant medical information was recorded in Torcivia's CPEP chart, which is in the court record. *See* Plaintiff-Appellant's Appendix of Exhibits.

[9] The parties' accounts differ as to whether Officer Adler spoke with Adrianna on his first visit to the house (at 1:00 a.m.), on the second visit (at around 3:00 a.m.), on the third visit (at around 5:00 a.m.), or on more than one occasion.

(testimony of Officer Adler). Torcivia's wife denied knowing the combination to the gun safe in which Torcivia's firearms were stored, however, and as a result, at approximately 5:00 a.m. on April 6, Officer Adler returned to CPEP. Through a CPEP staff member, he transmitted his request that Torcivia divulge the combination to his gun safe. Torcivia did not do so—because he was either asleep or uncooperative—and Officer Adler departed.

At 2:20 p.m. on Sunday, after Torcivia had awakened, Nurse D'Anna met with him to conduct an emergency psychiatric evaluation.[10] She concluded that there was "no indication for acute psychiatric admission" and that Torcivia was "not imminently dangerous" to himself or others. App'x at 563. She then recommended to Dr. Yacoub that Torcivia be discharged. Having received Nurse D'Anna's evaluation and recommendation, and upon his own independent evaluation, Dr. Yacoub too formed the view that Torcivia did not require inpatient treatment and could safely be discharged.

The parties agree that Torcivia was not formally discharged until nearly 6:00 p.m. that day, after he gave his wife the combination to his gun safe and Suffolk County police seized his firearms.[11] Torcivia, the County Defendants, the State Defendants, and Intern Smith disagree as to what occurred in the few hours before his discharge, and as to whether his release was delayed to permit the County to seize his firearms or was otherwise conditioned on their seizure. Torcivia asserts that Intern Smith conditioned his discharge on his surrender of his firearms. Intern Smith denies doing so, and the

_____

[10] CPEP staff had also done a quick initial triage evaluation when Torcivia first arrived at CPEP in the very early hours of April 6, just after 2:00 a.m.

[11] As a part of his discharge materials, CPEP staff gave Torcivia a list of recommended resources for obtaining treatment for substance or alcohol abuse, but made no additional recommendations for treatment.

State Defendants maintain that even if she did, it was not pursuant to an order by Dr. Yacoub or Steele. No party disputes, however, that before Torcivia was released, a CPS caseworker contacted Intern Smith to express concerns for the safety of Adrianna, who had again called CPS to say that she was frightened by Torcivia's impending release and return to the Ronkonkoma home.[12]

## II. Procedural history

### A. The District Court action

Two years later, Torcivia brought suit in the U.S. District Court for the Eastern District of New York. In addition to unidentified defendant John Doe Police Officers, he proceeded primarily against eight defendants relevant to this appeal: the County Defendants (the County and Officers Adler, Halpin, and Verdu); the State Defendants (Dr. Yacoub, Kristen Steele, and Dianna D'Anna); and Intern Mary Catherine Smith.[13] In

---

[12] Although the record is unclear about the exact number of times that Adrianna called CPS, Torcivia does not dispute Intern Smith's assertion that it was her understanding that Adrianna had called CPS four times.

[13] In addition to those defendants identified in the text, Torcivia sued CPEP employees Timothy Aiello, Bridget Walsh, and Michelle Sanchez. He voluntarily dismissed his action against them in December 2017. App'x at 14 (Dkt. 91, 92). He also named as defendants two more law enforcement personnel—Suffolk County Police Investigator Thomas Carpenter and Captain William Scrima—but in his brief he advises that he does not wish to appeal the District Court's determinations that they did not violate the Second Amendment or the Fourteenth Amendment by failing to provide a hearing before revoking his pistol license. *See* Appellant's Br. at 2 n.3; *see also* n.15, *infra*.

We note further that Torcivia sued the individual County Defendants in their "individual and personal capacities" as well as in their "official capacities." He sued the State Defendants and Intern Smith in their "individual and personal" capacities. App'x at 28-30. The caption of the First Amended Complaint also referred to the County Defendants as being sued in their "professional" capacities. *Id.* at 27. We understand the "professional" capacity designation to indicate that the particular defendant acted under color of state law, as required to obtain damages under § 1983.

10

his first amended complaint, operative here ("the complaint"), Torcivia advanced sixteen causes of action seeking compensatory and punitive damages and other relief for alleged violations of his rights under the First, Second, Fourth, and Fourteenth Amendments, all brought under 42 U.S.C. § 1983. He also presented claims for unlawful imprisonment, defamation, and negligence under New York common law.

Torcivia voluntarily dismissed some of his initial claims against certain parties in June 2018.[14] After this winnowing, the District Court disposed of most claims at summary judgment and of a few at trial, after a jury verdict on two fact questions resulted in judgment for the County Defendants on all remaining counts.

After further abandonment on appeal of the remaining Second Amendment counts,[15] the following claims are at issue on appeal:

---

[14] By letter dated June 12, 2018, Torcivia voluntarily dismissed his Second and Fourth Amendment § 1983 conspiracy claims against the State Defendants, his Fourth Amendment claim for seizure of property against Officer Adler, and his First Amendment retaliation claim against the County. *See* App'x at 125 n.1.

[15] Torcivia initially brought Second Amendment claims arising from the County's revocation of his New York State pistol license in June 2014, approximately two months after he was taken to CPEP. App'x at 503-05. An administrative challenge to the revocation pursued by Torcivia was still unresolved as of the District Court's summary judgment decision and is not part of this appeal. Torcivia moved for partial summary judgment on (1) his *Monell* claim under the Second Amendment arising from the County's pistol licensing and revocation policies, and (2) his claims against Investigator Thomas Carpenter and Captain William Scrima arising from the pistol license revocation. In its summary judgment ruling, the District Court addressed Torcivia's Second Amendment arguments as assailing the County's "revocation and seizure policy" and concluded that the policy is "consistent with the Second Amendment." *Torcivia*, 409 F. Supp. 3d at 38. Torcivia makes no related claims in this appeal. *See* Appellant's Br. at 2 n.3 (advising the Court that "[c]laims involving the pistol licensing bureau, Thomas Carpenter, William Scrima, and Second Amendment Violations are not the subject of this appeal."). We therefore do not address these issues further, except insofar as they relate to the separate Fourth Amendment seizure claims. We note, however, that we are unaware of any steps taken by Torcivia to preserve these claims or arguments for subsequent proceedings in the face of the District Court's judgment and this subsequent appeal.

- *Two claims against Suffolk County*: A § 1983 claim under *Monell v. Dep't of Social Servs*, 436 U.S. 658 (1978), based on features of the County's firearm-removal policy that Torcivia contends violate the Fourth Amendment's prohibition on unreasonable seizures made without a warrant; and a common law claim for false imprisonment based on Officers Adler's, Halpin's, and Verdu's transport of Torcivia to CPEP. *See* App'x at 56-57, 126.

- *Three parallel claims against Officers Adler, Halpin, and Verdu, individually, plus two apparently against Officer Adler alone*: A Fourth Amendment claim under § 1983 for "unlawfully seizing plaintiff and causing his confinement without any privilege"; a First Amendment claim under § 1983 for seizing him in retaliation for his exercise of free speech rights; and a New York common law claim for false imprisonment, *see* App'x 53–54, 57, 125. *Against Officer Adler alone:* a § 1983 stigma-plus claim and a state law defamation claim.[16]

- *Two claims against the State Defendants and Intern Smith*: A Fourth Amendment claim under § 1983 for unreasonably prolonging his confinement at CPEP until he provided his gun safe combination to allow seizure of his firearms; and a common law claim for false imprisonment based on alleged violations of state law regarding involuntary confinement. *See* App'x at 54, 125–26.

Our discussion of the procedural history of this case is limited accordingly.

B.      The parties' cross-motions for summary judgment

After discovery, the parties cross-moved for summary judgment. The County Defendants sought judgment on (1) the Fourth Amendment *Monell* claim regarding the seizure of Torcivia's guns; (2) the § 1983 stigma-plus claim, and (3) the common law

---

[16] Torcivia's June 2018 letter identified stigma-plus and defamation claims as remaining only as to Officer Adler. The District Court, however, addressed Torcivia's stigma-plus claim as if made with regard to both Officers Adler and Verdu. It rejected the County's defense that the allegedly defamatory statements were privileged, concluded that it was unable to rule on the claim as a matter of law, and remitted the issue for trial.

claims for unlawful imprisonment. The State Defendants and Intern Smith sought summary judgment on all claims against them. Torcivia cross-moved for partial summary judgment against the County Defendants with respect to his Fourth Amendment *Monell* claim and his due process claims.

In an extensive opinion, the District Court (LaShann DeArcy Hall, *J.*) dismissed all federal claims against the State Defendants and Intern Smith based on federal qualified immunity and all state common law claims against them based on state qualified immunity. It denied in part and granted in part Torcivia's motion for partial summary judgment, granting his motion seeking judgment against the County as to his firearm-related Fourteenth Amendment Due Process claim regarding the seizure of his rifles.[17] (The County did not appeal this finding.) Finally, the District Court granted in part and denied in part the County Defendants' motion for summary judgment, dismissing Torcivia's Fourth Amendment *Monell* claim but permitting his unlawful imprisonment and the stigma-plus claims against the County Officers to proceed to trial along with the First Amendment retaliation, Fourth Amendment seizure of his person, and defamation claims that were not subject to a summary judgment motion.

C.      The jury trial on Torcivia's remaining claims

The County Defendants and Torcivia consented to a jury trial before a U.S. Magistrate Judge (Gary Brown, *M.J.*). After a three-day jury trial, U.S. Magistrate Judge (now District Judge) Brown charged the jury with a special verdict form containing the following factual questions: (1) "Has plaintiff established by a preponderance of the evidence he did not make any suicidal statements in the presence of the defendant

---

[17] In its summary judgment order, the District Court ordered the County to afford Torcivia a hearing regarding the deprivation of his longarms. It is not clear whether the County did so, but as explained below, the Court later awarded damages based on the summary judgment order's finding of liability after the trial of Torcivia's other claims.

police officers, yes or no?", and (2) "Has plaintiff established by a preponderance of the evidence that the defendant police officers transported him to the CPEP to retaliate in whole or in part for statements he made?" App'x at 1747. The jury answered "No" to the two questions and the court entered a verdict in defendants' favor. *Id.* at 24 (Dkt. entry dated 11/08/2019 and Dkt. 179). The court then determined "given the sole evidence adduced at trial that damages for the recovery of the longarms was $100.00, said figure is the appropriate damage amount as to this claim," and entered judgment accordingly. *Id.* (Dkt. 183); *see also id.* at 1817. It also awarded Torcivia attorneys' fees on that claim.

Torcivia timely appealed both the District Court's summary judgment order and the judgment entered on the jury's verdict.

## DISCUSSION

### I.  The County Defendants

Torcivia seeks reversal of the District Court's award of summary judgment to the County on his Fourth Amendment *Monell* claim, which he premises on Suffolk County's alleged firearm-removal policy. He also demands a new trial for his stigma-plus, defamation, First Amendment retaliation, and Fourth Amendment and common law unlawful imprisonment claims against Officers Adler, Verdu, and Halpin in light of three evidentiary rulings made at trial. We reject these arguments for the reasons set forth below.

#### A.  The Fourth Amendment *Monell* claim

We review *de novo* a district court's order granting summary judgment. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 103 (2d Cir. 2010) (applying same standard to cross-

14

motions for summary judgment).[18] The court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Delaney*, 766 F.3d at 167.

To establish a claim for *Monell* liability, Torcivia must show that the Country had "(1) an official policy or custom that (2) cause[d] [him] to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). The District Court determined that a reasonable juror could conclude Suffolk County has a custom or policy of seizing an individual's firearms to safeguard them when the owner has been transported for psychiatric evaluation following a domestic incident. Such a policy, it reasoned, "qualifies as a special-needs seizure." *Torcivia v. Suffolk Cnty., New York*, 409 F. Supp. 3d 19, 31 (E.D.N.Y. 2019). It then found "that the seizure in this case was reasonable" under the Fourth Amendment, in light of the State's "substantial and legitimate interest in insuring the safety of the general public," an interest that the District Court called "particularly acute in circumstances involving mental health and domestic violence." *Id.* On this basis, it concluded that the policy as applied to Torcivia did not unlawfully interfere with his Fourth Amendment rights.[19]

_____

[18] Unless otherwise noted, in quotations from caselaw, this Opinion omits all alterations, brackets, citations, emphases, and internal quotation marks.

[19] The District Court acknowledged that Torcivia sought to press both "facial" and "as-applied" challenges to the County's policy, but it rejected the facial challenge, observing that "a party 'who fails to demonstrate that a challenged law is unconstitutional as applied to [him] has necessarily fail[ed] to state a facial challenge, which requires [him] to establish that no set of circumstances exists under which the statute would be valid.'" *Torcivia*, 409 F. Supp. 3d at 35 n.10 (quoting *United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012)).

### 1. *The policy that Torcivia challenges*

Torcivia alleges that "[i]t is the policy of the Suffolk County Police Department to seize all handguns and long guns from a home when a resident is transported to a comprehensive psychiatric emergency program." Appellant's Br. At 18; *see also Torcivia*, 409 F. Supp. 3d at 29 n.6. The District Court determined that a reasonable juror could conclude that a seizure policy exists, but only in a form "notably narrow[er]" than Torcivia contends. *Id.* at 29. The District Court concluded that the record evidence (specifically, the deposition testimony of Officer Adler, which was the only evidence supporting the existence of any such County policy) permitted a reasonable jury to find that it was a "standard procedure" of the Suffolk County Police Department for officers to temporarily take action to "safeguard weapons until whatever investigation is done" if two features are present: "there is a domestic incident *and* somebody is transported to CPEP." *Id.* at 29–30 (emphasis added); *see also* App'x at 391 (testimony of Officer Adler describing County's practice).[20]

---

[20] The relevant part of Officer Adler's deposition testimony, which occurred during cross-examination, reads as follows:

> Q: What was the substance of the conversation with Sergeant Lawler?
>
> A: To give him a briefing of the situation, of the overall call and the fact that I do have a positive result for the pistol licenses.
>
> Q: What, if anything, did he say?
>
> A: He said we have to try our best, as best we can to safeguard the weapons which means going back to the house, attempt to safeguard the weapons. If that doesn't work go back to CPEP and try to talk to Mr. Torcivia himself and see if he will give you authorization to safeguard the weapons.
>
> Q: What was the purpose of safeguarding the weapons?

We agree with the District Court, and the County does not appear to contest, that the record evidence would support the conclusion of a reasonable juror that the County maintains such a two-pronged policy or practice. As the District Court explained, Torcivia did not "provide[] any evidence to support th[e] broader policy" that he claimed exists, in which transport to an emergency mental health program alone would prompt the County to seize any firearms kept by the transported individual. *Torcivia*, 409 F. Supp. 3d at 29 n.6. Torcivia points to nothing that contradicts the District Court's conclusion in this respect; rather, he proceeds to challenge this narrower policy as also violative of the Fourth Amendment's constraints both in general, and specifically under the circumstances attending the seizure of his firearms.

We therefore proceed to assess the merits of his challenge to a policy pursuant to which the County temporarily seizes firearms belonging to an individual who is transported for emergency mental health evaluation following a domestic incident.[21] We start by evaluating the County's policy generally, and then turn to considering the seizure in Torcivia's case.[22]

---

A: When there is a domestic incident and somebody is transported to CPEP for evaluation that's standard procedure to safeguard weapons until whatever investigation is done.

App'x at 391.

[21] Although the County does not admit that such a policy or custom exists, on appeal the County does not challenge the District Court's conclusion that a reasonable jury could find that it does. Instead, it defends the District Court's dismissal of Torcivia's *Monell* claim on the ground such a policy or custom falls within the special needs exception. For simplicity, we will refer to the County's alleged firearm seizure policy or custom as described here as the County's "policy" in this Opinion.

[22] The only "search or seizure" at issue in this appeal related to Suffolk County's *Monell* liability is the seizure of Torcivia's firearms.

17

### 2. *The County's policy serves a special need*

Under the Fourth Amendment,[23] government seizures of a person or of property in a person's home without a warrant are "presumptively unreasonable." *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014). Nonetheless, courts have long recognized several limited exceptions to this general rule. Among these is the special needs exception, which applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, *J.*, concurring); *see also Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).[24]

---

[23] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[24] Torcivia observes—correctly—that, in the District Court, the County did not move for summary judgment on the basis of the special needs exception. He argues on this basis that the District Court erred in granting the County's motion in reliance on that exception. His argument has some force: as a general matter, our legal system "follows the principle of party presentation" by "rely[ing] on the parties to frame the issues for decision and assign[ing] to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1576 (2020). But the "party presentation principle is supple, not ironclad[,]" and "a court is not hidebound by the precise arguments of counsel." *Id*. at 1579, 1581; *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). Here, Torcivia has offered at most a cursory argument that the District Court erred by raising the special needs exception. Although the County did not present the exact theory the District Court relied on, the County had moved for summary judgment on the issue of its Fourth Amendment liability under *Monell* for the seizure of Torcivia's firearms. We observe

To be covered by this exception, a seizure must at the threshold "serve as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation." *MacWade v. Kelly*, 460 F.3d 260, 268 (2d Cir. 2006); *see also Lynch v. City of New York*, 589 F.3d 94, 100 (2d Cir. 2009) (noting that the special needs policy's primary purpose must be more than pursuing a general interest in crime control).

The County's policy permitting warrantless seizures of firearms is reasonably understood as applying to situations in which, following a "domestic incident [after which] somebody is transported to CPEP" for emergency psychiatric evaluation, App'x at 391, the police learn that there are guns at the residence shared by the parties to the incident. Based on the record, we understand the policy to be focused on the related concerns of prevention of domestic violence and prevention of suicide. Indeed, Torcivia acknowledges that "the purpose of the County's firearms seizure policy is to prevent an individual who has been transported for an evaluation from harming themselves or another person." Appellant's Br. at 19.

Torcivia nonetheless endeavors to label this policy as a form of "crime control." *Id*. But that general rubric obscures the immediate goal of the policy: to prevent self-harm and harm within a family when a mental health condition becomes acute, when there may be a heightened risk of domestic violence or suicide, and when firearms are present. On the record before us, we think it is accurately understood to address on an emergency basis public safety issues at the intersection of mental health and domestic

---

further that Torcivia did not move for reconsideration on this issue before the District Court. Based on the record in this case, we conclude that the District Court did not depart "so drastically from the principle of party presentation as to constitute an abuse of discretion," *Sineneng-Smith*, 140 S. Ct. at 1578, by relying on the special needs exception. Additionally, any prejudice to Torcivia is mitigated by his full opportunity to be heard on this issue on appeal and this Court's *de novo* review of the District Court's grant of summary judgment.

violence. It envisions a temporary seizure of both person and firearms to defuse a critical situation in which an individual may pose a danger to himself and members of his household on account of mental instability or substance abuse and the presence in the home of firearms.

In such circumstances, the urgency of the situation may limit the options available to a responding officer, despite the general risk of suicide or domestic violence involving firearms and the immediate need for mental health intervention. *See, e.g.*, *Griffin*, 483 U.S. at 876 (warrant and probable cause requirement impracticable for probation officer's search of home because of intrusion on the probation system and risk of delay). We expect and desire our law enforcement agents to respond effectively and quickly to such situations; because they can involve violence and firearms, dispatching a mental health professional alone may not be an adequate response.

By contrast, Torcivia points to nothing in the record to suggest that the primary purpose of the County's firearm-seizure policy is evidence-gathering or that it was "undertaken for the investigation of a particular crime." *Lynch v. City of New York*, 737 F.3d 150, 158 (2d Cir. 2013). Although the policy involves safeguarding firearms "until whatever investigation is done," we understand that investigation to be unrelated to any law enforcement investigation into whether the firearms have been used in a crime. Here, for example, there was no allegation that Torcivia had committed a crime: Adrianna did not claim that she had been assaulted, or that a firearm had been displayed or used in any way during the altercation, and the police verified before seizing the weapons that Torcivia possessed licenses for those weapons that required one.

Moreover, "[a] policy may have multiple purposes, including one directly related to crime control, but so long as the primary purpose is a government interest other than crime control the mere fact that crime control is one purpose does not bar the

20

application of the special needs doctrine." *Jones v. Cnty. Of Suffolk*, 936 F.3d 108, 115 (2d Cir. 2019). That preventing suicide and domestic violence perpetrated with firearms in a tinderbox situation may be said to "control crime" generally does not mean that the County's policy is excluded from the category of acute cases that warrant an urgent special needs exemption.

All in all, we agree with the District Court that Suffolk County's policy serves a special need beyond the normal need for law enforcement.[25]

---

[25] In so concluding, we rely (as did the District Court) on the "special needs" exception as described in this Opinion, and not on any other Fourth Amendment exception, to address the County's policy. We understand the special needs exception to be different from a "community caretaking exception" that some circuits formerly drew from *Cady v. Dombrowski*, 413 U.S. 433 (1973). *Cady* allows certain warrantless searches of vehicles, *id.*, and some courts had read it also to permit certain warrantless searches of private premises, including homes. *See Caniglia v. Strom*, 953 F.3d 112, 124 (1st Cir. 2020) (collecting cases). Earlier this year, in *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), the Supreme Court rejected that interpretation of *Cady*. Although *Caniglia* involved facts bearing some resemblance to those presented here, it did not address the special needs doctrine or a situation in which officers acted pursuant to a government seizure policy in specified circumstances; rather, the Supreme Court rejected the extension of the *Cady* community caretaking exception from searches of vehicles to searches and seizures in homes. *Id.* at 1599-1600. In doing so, it expressed concern about the breadth of the exception that the First Circuit articulated, noting that "[a]ll that mattered [to the court] was that respondents' efforts to protect petitioner and those around him were distinct from the normal work of criminal investigation, fell within the realm of reason, and generally tracked what the court viewed to be sound police procedure." *Id.* at 1599.

Unlike the community caretaking exception, the special needs exception has been repeatedly recognized by the Supreme Court as permitting searches undertaken without a warrant, *see Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619–20 (1989) (collecting cases), including in situations involving the warrantless search of a home. *See Griffin*, 483 U.S. at 876; *see also Jones*, 936 F.3d at 119 (warrantless seizure of sex offenders at home falls within special needs exception). The special needs exception also involves a well-established four-factor balancing test, as discussed in this Opinion, contrary to the Supreme Court's concern that the community caretaking exception, as defined by the First Circuit in *Caniglia*, created "an open-ended license to perform [community caretaking functions] anywhere." *Caniglia*, 141 S. Ct. at 1600. We proceed on the understanding that "*Caniglia* did not disturb this Court's longstanding

### 3. *The County's policy is constitutional*

As the District Court recognized, searches and seizures covered by the special needs exception still must be "reasonable" to comport with the Fourth Amendment. *See Jones*, 936 F.3d at 118. Determining the reasonableness of seizures under the special needs exception requires courts to balance four factors: "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest allegedly compromised by the [seizure], (3) the character of the intrusion imposed by the [seizure], and (4) the efficacy of the [seizure] in advancing the government interest." *MacWade*, 460 F.3d at 269. Balancing these factors, we conclude that the County's firearm-seizure policy is constitutionally reasonable.

The first and fourth factors weigh in favor of the County. The County has a substantial governmental interest in preventing suicide and domestic violence. *See Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (*per curiam*) (recognizing "the preservation of life" and "prevention of suicide" as "compelling government interests"); *cf. Henry v. Cnty. of Nassau*, 6 F.4th 324 (2d Cir. 2021) ("It may be that the issuance of an *ex parte* order [related to a domestic violence incident] justifies a temporary license suspension and firearm confiscation to allow the County to investigate whether the subject of the order poses a threat to the safety of others.").

---

precedents that allow warrantless entries into a home in certain circumstances." *Sanders v. United States*, 141 S. Ct. 1646, 1647 (2021) (Kavanaugh, *J.*, concurring in certiorari grant, vacatur, and remand in light of *Caniglia*); *see also id.* (explaining that the use of "a now-erroneous label does not mean that the [lower court] reached the wrong result"). Although exceptions to the Fourth Amendment's warrant requirement related to law enforcement's community caretaking responsibilities may be relevant in instances other than those presented in *Caniglia*, *see* 141 S. Ct. at 1601 (Alito, *J.*, concurring), *id.* at 1603 (Kavanaugh, *J.*, concurring), we do not conceive of the appeal before us as involving the community caretaking exception as broadly articulated by the First Circuit, and we do not rely on that doctrine in our analysis.

As the Supreme Court has recognized, "[d]omestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *United States v. Castleman*, 572 U.S. 157, 160 (2014). The District Court detailed considerable research that domestic violence and gun violence are closely linked. Strikingly, more intimate-partner homicides have been committed with firearms than with all other weapons combined over the past 25 years. April M. Zeoli & Shannon Frattaroli, *Evidence for Optimism: Policies to Limit Batterers' Access to Guns, in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* 53-63 (Daniel W. Webster and Jon S. Vernick eds., 2013).[26] In States that require individuals subject to restraining orders to relinquish firearms, intimate partner-homicide rates were fourteen percent lower than in States that did not have such requirements. *See* Carolina Díez et al., *State Intimate Partner Violence-Related Firearm Laws and Intimate Partner Homicide Rates in the United States, 1991 to 2015*, 167 Annals Internal Med. 536 (Oct. 17, 2017), https://annals.org/aim/fullarticle/2654047/state-intimate-partner-violence-related-firearm-laws-intimate-partner-homicide.

---

[26] Torcivia criticizes the District Court's reference to this source and others cited in its opinion as using "purported statistics that Appellant had no opportunity to challenge." Appellant's Br. at 23; *see also* Appellant's Reply at 16 ("the district court referenced various articles, statistics, and anecdotal 'evidence', the reliability of which Mr. Torcivia never had the opportunity to challenge."). But Torcivia does not explain why the sources relied on by the District Court were not appropriate for judicial notice (at least as to their existence as academic commentary) or were otherwise unreliable. Nor does he offer any basis for treating the District Court's references to the sources as reversible error or claim that he sought and was denied an opportunity to rebut the conclusions of these analyses. Moreover, Torcivia does not challenge the substance of any of the sources relied on by the District Court, despite his opportunity to do so in this appeal. Accordingly, we identify no error in the District Court's reliance on these sources nor any grounds to question their accuracy. To the extent that we rely on the same sources and statistics as did the District Court, we do so because they are part of the appellate record and because we find them reliable and informative with regard to the issues on appeal.

The District Court also persuasively detailed the troubling role of firearms in connection with suicide. According to recent research, on average more than 23,000 Americans committed suicide using firearms each year from 2014 to 2019, and almost two-thirds of gun deaths in the United States are suicides. Everytown for Gun Safety, *Firearm Suicide in the United States*, https://everytownresearch.org/report/firearm-suicide-in-the-united-states/ (last updated Sept. 1, 2021).[27] Tragically, about 90% of suicide attempts that employ a gun result in death, compared with less than 5% of attempts by different means. *Id*. The temporary removal of firearms in situations with heightened risk of domestic violence or suicide may reduce the risk of such tragic consequences.

The urgency of the County's interest in preventing self-harm or domestic violence is diminished by the County's policy of seizing firearms in the home in situations where a person is already physically "transported" away from the home for mental health evaluation, thus necessarily restricting the person's access to those firearms on a temporary basis. *See* App'x at 391 (testimony of Officer Adler). Still, the temporary separation of the person from his or her firearms notwithstanding, the possibility that the person regains access to the firearms before the conclusion of the investigation or that someone else gains access to the firearms in the meantime confirms that the policy advances the County's important interest in preventing self-harm or domestic violence.

We therefore conclude that the County's policy serves an important and immediate government interest, and that the seizure of firearms under that policy represents a reasonable and effective method of advancing that interest.

---

[27] This statistic is drawn from an updated version of a resource cited by the District Court. *See Torcivia*, 409 F. Supp. 3d at 31-32.

The second factor, the nature of the privacy interest asserted, favors Torcivia. As the District Court acknowledged, the County's Pistol License Guidelines cautioned that "[i]f a police officer or member of the pistol license bureau requests you to surrender your license and firearm(s), and you refuse . . . you may be arrested." *Torcivia*, 409 F. Supp. 3d at 33. While the District Court found that since Torcivia was "put on notice that his firearms could be surrendered upon the revocation of his pistol license, he had a diminished privacy interest in his firearms," *id.* at 34, we are unpersuaded that the license created more than a marginal reduction in Torcivia's privacy interest. Indeed, unlike the reduced privacy expectations of a parolee, for example, whose terms of supervised release may feature unscheduled visits by parole officers, *see Griffin*, 483 U.S. at 873-75, we have never held that obtaining a license, such as Torcivia's, to maintain a firearm in one's home more than marginally reduces an owner's privacy interest in his home or his firearms, either by itself or by the terms of the license. *Cf. Palmieri v. Lynch*, 392 F.3d 73, 82–83 (2d Cir. 2004) (identifying reasons beyond appellant's application for a construction permit as important in concluding that he had a diminished expectation of privacy). Even so, a finding against the government on this second factor alone may not render warrantless seizures unreasonable. *Cf. MacWade*, 460 F.3d at 269, 272–73 (finding random, suspicionless container searches on subway a reasonable measure to prevent terrorist attacks even though subway passengers have a legitimate expectation of privacy in their containers).

As to the third factor—the character of the intrusion—the County's policy provides for a minimal intrusion into the firearms of a person who is transported to CPEP following a domestic incident. Under the policy, the seizure of firearms is only temporary and is executed to "safeguard weapons until whatever investigation is

done."[28] App'x at 391. Although the nature of the seizure is not so "brief and unobtrusive" as to have this factor weigh heavily in the government's favor, *see Jones*, 936 F.3d at 118, the temporary seizure pending an investigation is nonetheless narrowly confined to a relatively brief investigatory period, with the owner's rights to the firearms largely unaffected by the temporary seizure. We conclude that this factor is neutral.

In sum, the first and fourth factors favor the County; the second, Torcivia; and the third is neutral. Weighing these factors together, we conclude that the County's firearm-seizure policy speaks to a "special need" and is constitutionally reasonable. The County's policy does not violate the Fourth Amendment.

### 4. *The policy's application to Torcivia does not establish* Monell *liability*

Torcivia insists that the County's application of the policy was unreasonable and violated his Fourth Amendment rights on the specific facts of this case. The reasonableness of the County's seizure of Torcivia's firearms presents a close call because of some unusual features of the factual scenario. We ultimately need not resolve this issue, though, because, to the extent that the seizure of Torcivia's firearms was unreasonable under the facts of this case, we conclude that the seizure was caused by County officers' *departure* from the County's policy, not the policy itself.

The first and fourth reasonableness factors related to the seizure of Torcivia's firearms weigh in favor of the County, but to a more limited extent than they do for the

---

[28] To the extent the County officers here acted pursuant to the policy—and, as discussed below, it is not clear that they did—it appears that the word 'investigation' has a broader meaning than *criminal* investigations. Rather, Torcivia received a psychiatric evaluation, followed by a prompt administrative proceeding revoking his pistol permits; he was never charged with a crime, and it is not clear that, after the guns were seized, the police undertook any further investigation into whether a crime had been committed.

policy in general. Against the broader context of domestic violence, suicide, and firearms as discussed above, the police were called to Torcivia's home around 1:00 a.m. at the end of a Saturday night to respond to what they were told was a "violent, domestic dispute."[29] App'x at 981. After discovering that Torcivia had a pistol permit, the officers began to try to seize Torcivia's guns as a temporary safeguard while they investigated the domestic incident, a seizure that they eventually accomplished. On this record, the officers' actions and eventual seizure of Torcivia's weapons served the important and immediate government interest of lowering the likelihood of firearm-related domestic violence and suicide upon Torcivia's return to his home and until the investigation was complete. Likewise, there is no doubt that the temporary removal of Torcivia's firearms was an effective method of advancing that interest by completely eliminating the firearms from the situation.

Torcivia contends that the seizure of his firearms was unreasonable because the mental health evaluation he received at CPEP found that he was not suicidal or an imminent danger to others before his firearms were seized. The parties dispute when Torcivia's medical evaluation and discharge occurred in relation to the seizure of his firearms.

We recognize that the County's interest in temporarily seizing Torcivia's firearms would have been somewhat reduced if medical professionals had already determined that he was not suicidal or a danger to others.[30] As reflected in his medical

---

[29] The officers dispatched to Torcivia's home told they were responding to a "violent domestic" dispute, described by one officer as an incident in which there "could have been violent behavior, whether it be physical or verbal." App'x at 191 (testimony of Officer Verdu).

[30] The District Court acknowledged that, "if Plaintiff had adduced evidence that the County had a policy of seizing firearms from individuals who had already been medically discharged from CPEP, the Court might weigh these [reasonableness] factors differently." *Torcivia*, 409 F. Supp.

records, at 3:21 p.m. Nurse D'Anna wrote that Torcivia "is not imminently dangerous to self and others."[31] Exhs. at 32. She discussed her assessment with Dr. Yacoub at some point later that day. Dr. Yacoub independently evaluated Torcivia, and stated in a note entered at 6:59 p.m. that Torcivia's "[r]isk is low at the present time but may increase if [he] use[s] alcohol and/or drugs." *Id.* A reasonable jury could infer that, based on his medical evaluation, Torcivia (after several hours of sleep and dissipation of the effects of his high blood alcohol level) posed less of a threat to his family and himself than the officers believed when they transported him to CPEP, and therefore that the weight and immediacy of the County's interest in seizing his firearms when the seizure actually took place had been reduced.

To be sure, the eventual results of the CPEP mental health evaluation and Torcivia's clearance for discharge do not necessarily mean that a temporary seizure of Torcivia's guns was unreasonable. When Torcivia's firearms were seized, the officers' investigation into the incident had yet to be completed, and its full circumstances were still not known. And, before Torcivia was released, Adrianna had again called CPS—up to four times, by Intern Smith's understanding—to say that she was frightened by

---

3d at 35. But it explained that, in its view, "the record indicates that Dr. Yacoub only determined that Plaintiff could be medically discharged after Plaintiff's firearms had already been seized." *Id.* n.11. The Rule 56.1 statement that the District Court cited to, however, does not actually address the timing of the medical discharge, and we conclude based on the record on appeal that this fact is in dispute. Accordingly, we assume the truth of Torcivia's claim that the guns were seized after the responsible physicians had decided that he was not a danger to himself. In any event, there is no evidence beyond what happened in this case to suggest that the County has a policy of seizing firearms from individuals who already had been medically discharged.

[31] Nurse D'Anna's notes reflect that, when she determined that Torcivia was not imminently dangerous, she had a (mistaken) understanding that Torcivia did not have access to firearms, presumably at his home. *See* Exhs. at 32 ("Access to lethal means: no gun."). That misunderstanding was corrected by a note entered at 6:14 p.m., which stated that Torcivia "did have guns at home," but that the guns had been removed. *Id.* Dr. Yacoub's note entered at 6:59 p.m. states, "As per the notes, guns are removed from the house." *Id.*

Torcivia's impending release and return to their home. A CPS caseworker had expressed concern for her safety.

Moreover, as Dr. Yacoub stated, "There are certainly circumstances where a patient may not meet the standard for involuntary commitment but releasing him or her to a home with ready access to firearms would not be safe." App'x at 557; *see also Mora v. City Of Gaithersburg*, 519 F.3d 216, 228 (4th Cir. 2008) (police seizure of weapons justified despite the plaintiff's transport for mental health evaluation because "protecting public safety is why police exist, and nothing in Maryland's involuntary admission statute supports the remarkable suggestion that, by handing [the plaintiff] over to doctors, the officers relinquished authority over the thing for which they are under law chiefly responsible.").

Still, in the particular circumstances of Torcivia's case, medical staff had already determined not only that he did not need to be involuntarily committed, but also that he was not imminently dangerous to himself or others. Viewing the facts in the light most favorable to Torcivia, his claim that this determination had already been made before the firearms were seized—if proven—would lessen the weight and immediacy of the County's interest in seizing his firearms. Accordingly, we conclude that the first and fourth factors weigh in favor of the County on the facts of this case, but to a lesser extent than when evaluating the County's policy in general.

For substantially the same reasons explained above, the second factor—the nature of the privacy interest asserted—favors Torcivia. Torcivia had a privacy interest in his firearms, and that interest was not more than marginally diminished by the terms of his pistol license.

The third factor—the character of the intrusion imposed by the seizure—favors Torcivia at least with respect to the seizure of his longarms.[32] Although the County's policy provided for only temporary safeguarding of the weapons pending investigation, in this case the County never returned Torcivia's longarms, even though they are not subject to a licensing requirement. Some of this intrusion may be properly attributed not to the initial seizure on April 6, 2014, but rather to the County's failure to provide adequate post-removal process.[33] Still, in light of the extended intrusion into Torcivia's privacy interest in his firearms that resulted from the seizure of his longarms, we conclude that this factor may weigh in Torcivia's favor.

As the foregoing discussion suggests, viewing the facts in the light most favorable to Torcivia, the reasonableness of the seizure of his firearms would present a close call. But, again, in this instance, we ultimately need not resolve the issue because, to the extent that the seizure of Torcivia's firearms was unreasonable under the specific facts in this case, we can fairly conclude on the record that it was due to the officers' *departure* from the County's policy.

The County can be held liable under *Monell* only if its policy resulted in a violation of Torcivia's constitutional rights. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991).[34] If the seizure did not comport with the County's policy, which

---

[32] Torcivia's pistol license was promptly revoked as a result of the incident and was subject to an orderly review process that Torcivia does not challenge here, so the initial seizure on April 6, 2014, had only a nominal effect on his interest in his handguns.

[33] Torcivia has already received a remedy for the extended intrusion into his interest in his longarms because the District Court has entered judgment in his favor on his claim that the lack of post-removal process violated the Due Process Clause of the Fourteenth Amendment.

[34] Torcivia does not bring a Fourth Amendment claim for the seizure of his firearms against any individual County Officers. *See* App'x at 125-26.

itself is constitutional as discussed above, then the County is not subject to *Monell* liability: "constitutional torts committed by [municipal] employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, *J.*).

Here, to the extent that the policy's application to Torcivia may have been unreasonable, that unreasonableness was attributable not to the County's policy, but to the individual decisions of subordinate officers. Had the seizure of Torcivia's firearms occurred immediately after his transport to CPEP and before his medical evaluation, and had it been temporary—as provided in the County's policy—we would have no trouble concluding that it was reasonable. It presents a close call, at least taking the summary judgment record in the light most favorable to Torcivia, for reasons related primarily to two aspects of the seizure that did not comport with the County's policy: the indefinite seizure of Torcivia's longarms and that Torcivia's guns may have been seized after CPEP staff had already determined that Torcivia was not imminently dangerous to himself or others.

We are aware of no support in the record to indicate that the County's policy or custom was to seize the firearms of a person transported to CPEP after a domestic incident *despite* a medical assessment that the person posed no danger or to hold those firearms indefinitely. Indeed, as the District Court noted, the only evidence that Torcivia produced that the County had *any* policy or custom related to seizing firearms under these circumstances was Officer Adler's testimony.

Moreover, although *Monell* liability can be established "[w]here a [municipality's] official policy is constitutional, but [it] causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered

31

municipal policy," *Amnesty Am.*, 361 F.3d at 125, the record here does not support that theory of liability, either.[35] Torcivia points to no record evidence suggesting that the County was "aware that its policy may be unconstitutionally applied by inadequately trained employees but . . . consciously [chose] not to train them," that the seizure in this case was undertaken by a "decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered," or that "a policymaker ordered or ratified the subordinates' actions." *Id*. at 125–26. Indeed, while the parties agree that the County officers initially attempted to seize Torcivia's firearms shortly after transporting him to CPEP, Torcivia argues that the officers effectuated the actual seizure on the afternoon of Sunday, April 6, 2014, at the behest of the State Defendants and Intern Smith, and *not* because of the County's policy. Likewise, Torcivia does not argue that the County's policy is valid but its "actual practice" is unconstitutional, and he does not present any evidence that the County's actual practice is different than its policy beyond the disputed circumstances of this case. *Id*. at 126.

All in all, we conclude that the County's policy does not provide a basis for *Monell* liability because it complies with the Fourth Amendment and the policy did not cause a violation of Torcivia's constitutional rights. For these reasons, we affirm the District Court's judgment in favor of the County on Torcivia's Fourth Amendment *Monell* claim.

---

[35] Torcivia had an opportunity to develop these potential bases for *Monell* liability before the District Court because the County Defendants moved for summary judgment on Torcivia's Fourth Amendment *Monell* claim in part on the ground that the County Officers did not act pursuant to a County policy or custom. opposition argued that the County had a policy or custom of seizing firearms when an individual is transported to CPEP, as discussed above, but did not adduce evidence of the broader policy or provide any other basis for the County's *Monell* liability.

B.     A new trial is not warranted

We review a trial court's evidentiary decisions for abuse of discretion. *United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020). The standard is demanding: "[t]o find such an abuse we must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *Id.* A party seeking a new trial based on objections to evidentiary rulings must establish that the challenged rulings are both erroneous and harmful. *See Warren v. Pataki*, 823 F.3d 125, 138 (2d Cir. 2016); *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (discussing "harmless" errors).

The trial focused on two issues: whether Torcivia had proven by a preponderance that he had not made suicidal statements to Officers Adler and Halpin, and whether he had shown that the officers brought him to CPEP in retaliation for his speech. Torcivia seeks a new trial on his claims against Officers Adler, Halpin, and Verdu based on the following asserted evidentiary errors: (1) admitting Torcivia's CPEP chart into evidence; (2) admitting evidence of Torcivia's blood alcohol content measured after he arrived at the CPEP; and (3) precluding Torcivia from offering a limited portion of Adrianna's sworn deposition testimony. We identify no error warranting a new trial.

As an initial matter, the trial court gave careful consideration to the challenged rulings and provided a reasoned analysis for each, which undercuts Torcivia's position.

First, Torcivia's CPEP chart, which contained a compilation of medical information collected during Torcivia's time at CPEP, was not inadmissible insofar as it contains hearsay that falls outside the scope of Federal Rule of Evidence 803(4), which excludes from the rule against hearsay "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general

cause."[36] Contrary to Torcivia's arguments, the cases he relies upon are better read as providing *support* for the trial court's decision to permit the CPEP chart to be entered into evidence. *See, e.g.*, *Shea v. Royal Enterprises, Inc.*, No. 09-CV-8709 (THK), 2011 WL 2436709, at *11 (S.D.N.Y. June 16, 2011) ("There is no requirement that the statements be made by the patient, or that the statements be made to a physician."). And although Torcivia argues that the CPEP chart is unduly prejudicial, the County Defendants correctly note that Torcivia himself "opened the door and made the chart relevant by testifying to a 'breadth of the information' 'about his hospital stay and the reports in this case.'" County Br. at 28 (citing App'x at 1246). In light of this record, we conclude that the trial court did not abuse its discretion by admitting the CPEP chart into evidence.

Second, evidence of Torcivia's high blood alcohol level, measured at 2:50 a.m., showed that—consistent with trial testimony—Torcivia had been drinking before the police arrived. It signaled that he had likely consumed more than the "few cocktails" he acknowledged. It bore directly on the accuracy of the officers' account of Torcivia's condition when they arrived at his home, and the credibility of his daughter's stated reasons for her call to CPS. Torcivia suggests that admitting the evidence was unduly prejudicial to him, but we see no reason to disturb the trial court's decision to admit it. Torcivia's attorney informed the court that Torcivia was not contesting the lab result as it was reflected in his CPEP chart. App'x at 1279. Furthermore, we do not find evidence of Torcivia's blood alcohol content to be unduly prejudicial given his testimony about drinking prior to the arrival of the County officers and the officers' testimony about

---

[36] Torcivia also contends that the CPEP chart was not authenticated, but the record shows otherwise. *See* App'x at 1244-48.

34

Torcivia's intoxicated behavior.[37] We therefore identify no reversible error in the trial court's decision to admit evidence of Torcivia's blood alcohol level.

Third and finally, the trial court did not abuse its discretion by refusing to admit as evidence portions of the sworn deposition testimony of Adrianna, Torcivia's daughter whose phone call led to the police being dispatched to Torcivia's home.[38] Torcivia sought to introduce part of Adrianna's deposition testimony that, according to Torcivia, contradicts the County Defendants' narrative placing Officer Adler on the lower level of Torcivia's home with Adrianna rather than upstairs with Torcivia (where he alleges Officer Adler knocked down curtains from the front door window and sparked an altercation). After a colloquy with counsel for Torcivia and the County Defendants, the trial court reviewed the testimony that Torcivia sought to read into the trial record. Despite the issue presenting "a very close call," App'x at 1655, the trial court ultimately found that Adrianna's deposition was not reliable enough to establish the point for which Torcivia sought to use it. Instead, the court deemed it "sufficiently confusing under [Federal Rule of Evidence] 403"[39] such that admitting the testimony "would add more to the confusion of the case than it will clarify matters." App'x at 1653. Given our deference to the trial court's evidentiary rulings and Torcivia's failure

---

[37] To the extent that Torcivia now objects to statements made at summation about his blood alcohol content, we easily reject his argument. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) (applying plain error standard of review to statements made during closing argument when no objection was raised at trial).

[38] For the purpose of this evidentiary ruling, the trial court assumed that Adrianna was an unavailable witness pursuant to Fed. R. Evid. 804(a)(5). *See* App'x at 1653.

[39] Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

to identify any case law supporting his position, we conclude that this evidentiary ruling did not constitute an abuse of discretion.

In light of the foregoing, a new trial is not warranted.

## II.     The State Defendants and Intern Smith

Torcivia also seeks reversal of the District Court's award of summary judgment to the State Defendants and Intern Smith based on qualified immunity for their conduct in managing Torcivia after police transported him to CPEP. Although Torcivia challenges the District Court's determination that his false imprisonment claim against the State Defendants and Intern Smith under New York law is barred by qualified immunity under state law, he did not advance this argument before the District Court.[40] "The law in this Circuit is clear that where a party . . . advances arguments available but not pressed below, waiver will bar raising the issue on appeal." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005). We therefore find Torcivia's state law qualified immunity argument waived, and we address the substance of only his argument related to qualified immunity under federal law.

_____

[40] Torcivia argues in his reply brief that the issue is not waived because, in their summary judgment motion, "the State Defendants did not assert any factual argument to support alleged 'discretionary functions' to support their qualified immunity defense.'" Appellant's Reply Br. at 9. Thus, he argues, this appeal presented his first opportunity to make the state qualified immunity argument he now advances. But the State Defendants raised the defense of state qualified immunity in their summary judgment motion and articulated the relevant standard under New York law. *See* No. 15-cv-1791, Dkt. 137 at 19 (State Defs.' Mem. Supp. S.J.) ("State law offers immunity for government officials in the performance of duties requiring discretionary conduct, which involves 'the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result.'" (quoting *Tango v. Tulevech*, 61 N.Y.2d 34, 40–41 (1983))). Although the State Defendants' argument on this point may have been brief, Torcivia entirely failed to respond to it in his opposition to the motion. *See* No. 15-cv-1791, Dkt. 142 at 15-17 (Pl.'s Opp'n S.J.) (arguing against qualified immunity in general terms, citing only federal cases, and making no mention of the "discretion" standard under New York law).

In determining whether state actors are entitled to qualified immunity under federal law, we consider two factors: (1) whether the facts presented "make out a violation of a constitutional right"; and (2) whether the right at issue was "clearly established" when it was allegedly violated. *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010).[41] "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). In evaluating these two factors, we look to "the specific context of the case" at bar rather than "broad general proposition[s]." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2019).

We agree with the District Court that Torcivia has identified no Second Circuit or Supreme Court precedent that "clearly established" that by failing to discharge him for roughly sixteen hours for emergent mental health evaluation, allowing him first to return to sobriety and possibly keeping him for a few hours after he was medically cleared to be discharged, the State Defendants or Intern Smith violated Torcivia's constitutional rights.[42] On the contrary, we have rejected unlawful seizure claims made by plaintiffs detained for longer periods of time than Torcivia. *See, e.g., Kia P. v. McIntyre*, 235 F.3d 749, 762-63 (2d Cir. 2000) (one- to two-day detention of infant child withheld from parents' custody was not unreasonable seizure under Fourth

---

[41] Courts are free to use their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We elect here to focus on the second.

[42] Even assuming that Torcivia is correct that Intern Smith was acting under the color of state law pursuant to *Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012), as a state actor, she is entitled to qualified immunity for the same reasons as the State Defendants. Torcivia does not offer any argument why Intern Smith should not receive qualified immunity that is different than the reasons he advances with respect to the State Defendants.

Amendment); *cf. Bryant v. City of New York*, 404 F.3d 128, 131, 139 (2d Cir. 2005) (affirming dismissal of § 1983 Fourth Amendment claim where plaintiffs were jailed overnight but released between 5 and 23 hours after arrest).

Torcivia argues that in so detaining him, the State Defendants and Intern Smith violated New York state law and that accordingly, they violated a clearly established federal constitutional right. Even assuming that these defendants did violate state law as he contends, Torcivia's argument fails. "Our precedents have firmly established that the mere violation of a state law does not automatically give rise to a violation of federal constitutional rights." *Zahra v. Town of Southold*, 48 F.3d 674, 682 (2d Cir. 1995)**;** *see also United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (explaining that "state restrictions do not alter the Fourth Amendment's protections").

Because Torcivia has not shown that the State Defendants or Intern Smith violated a clearly established constitutional right by failing to discharge him for evaluation and because this factor is dispositive, no further analysis is necessary. We affirm the District Court's order granting summary judgment in favor of the State Defendants and Intern Smith on Torcivia's § 1983 claim.

**CONCLUSION**

For the reasons stated above, we conclude that the County is not subject to *Monell* liability for the seizure of Torcivia's firearms and that the District Court correctly determined that the doctrine of federal qualified immunity bars Torcivia's claims against the State Defendants and Intern Smith. We also find that Torcivia has waived his challenge to the District Court's state law qualified immunity determination, and we identify no reversible error in the trial court's evidentiary decisions. The order and judgment of the District Court are **AFFIRMED**.